# In the United States Court of Federal Claims

No. 19-505

(Filed: 7 April 2020)

```
*****************************************
NYCAL OFFSHORE DEVELOPMENT        *
CORPORATION,                      *
                                  *
           Plaintiff,             *   Motion to Dismiss; RCFC 12(b)(1);
                                  *   RCFC 12(b)(6); 28 U.S.C. § 1500;
v.                                *   Jurisdiction; Motion to Intervene; Statutory
                                  *   Interpretation.
THE UNITED STATES,                *
                                  *
           Defendant.             *
                                  *
*****************************************
```

*Jeffrey E. Glen*, Anderson Kill LLP, of New York, NY, for plaintiff.

*Eric E. Laufgraben*, Trial Attorney, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Allison Kidd-Miller*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, Civil Division, Department of Justice, all of Washington, DC, and *Denise Sebastian*, of Counsel, Office of the Solicitor, Division of Mineral Resources, United States Department of the Interior, of Washington, DC.

## OPINION AND ORDER

**HOLTE**, **Judge**.

Plaintiff Nycal Offshore Development Corporation ("Nycal") alleges the United States, acting through the Secretary of the Interior, confiscated its private property interests without just compensation when the Secretary terminated oil and gas leasehold interests and failed to notify Nycal of the termination. Compl. ¶¶ 43–51, ECF No. 1. Pending before the Court is the government's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1, ECF No. 6. On 23 October 2019, the Court held a status conference to discuss the government's motion to dismiss and Nycal's cross-motion to stay proceedings. *See* Order, ECF No. 21. Pursuant to the parties' agreement during that status conference, the Court initially considers only the government's 28 U.S.C. § 1500 argument before considering other issues presented in the government's motion to dismiss and Nycal's cross-motion to stay proceedings. *See* Order, ECF No. 23 (staying consideration of all other issues pending resolution of the § 1500 jurisdictional issue). On 24 October 2019, the Court ordered the parties to submit supplemental briefs specifically addressing whether § 1500 divests this Court of jurisdiction. *Id.* On 17 December 2019, the Court held oral argument on the § 1500 issue. *Id.* For the following reasons, the Court **DENIES-IN-PART** the government's motion to dismiss to the extent the government argues § 1500 bars this Court's exercise of jurisdiction.

## I.  Factual History

In 1990, Nycal purchased a 4.25313% fractional interest in three leases for oil and gas exploration off the coast of Santa Barbara, California (the "Gato Canyon leases"). Compl. ¶¶ 13–14.  Oil and gas leases "run for a fixed period of either five or ten years." *Id.* ¶ 12.  After the initial period, the leases will continue to run so long "as oil or gas is produced from the lease in paying quantities, or drilling or well reworking operations as approved by the secretary are conducted." *Id.* (quoting 30 C.F.R. § 256.37).  Leases no longer producing "in paying quantities within [a] primary term," or those without "drilling or well reworking operations . . . revert[] back to the Government unless the Secretary extends the lease" through a suspension. *Id.*

Offshore leases, including the Gato Canyon leases, were previously the subject of "extensive litigation in both the District Court for the Northern District of California and this Court." *Id.* ¶ 2.  Between 1968 and 1984, the Mineral Management Service ("MMS") of the Department of the Interior ("DOI") sold oil and gas leases with primary terms of five years. *California ex rel. Cal. Coastal Com'n, et al. v. Norton*, 150 F. Supp. 2d 1046, 1049 (N.D. Cal. 2001) (hereinafter "the California District Court litigation").[1]  At the request of lessees, from 1992 to 1999, MMS directed suspensions of the leases. *Id.*  In May 1999, lessees filed requests for further suspensions, which were ultimately granted on 12 November 1999. *Id.* at 1049–51.  Individual leases were suspended between 19 and 45 months. *Id.* at 1051.  Following the 1999 suspensions, the State of California commenced the California District Court litigation against the DOI.  The State of California asserted the 1999 suspensions were improper due to MMS' failure to comply with certain environmental regulations. *Id.* at 1048; *see also* Complaint, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 1 (Nov. 16, 1999).  On 20 June 2001, the District Court for the Northern District of California granted the State of California's motion for summary judgment, ordering suspension of the leases and all activities thereunder until the Secretary complied with the relevant sections of the Coastal Zone Management Act ("CZMA"), as amended in 1990.  Compl. ¶¶ 17–18; *see also Norton*, 150 F. Supp. 2d at 1057–58.

Following the 20 June 2001 suspension order, on 14 June 2002, Nycal and other leaseholders "filed complaints in the Court of Federal Claims asserting that the 1990 amendment to the CZMA . . . constituted a breach of the leases because the amendment . . . imposed new procedures and standards governing the grant of lease suspensions contrary to the terms of the leases." Mot. for Order Lifting Directed Suspensions of Offshore Leases at 3, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 178 (June 17, 2013); *see also Amber Res. Co. v. United States*, 68 Fed. Cl. 535 (2005) (the "*Amber Resources* litigation").  In the *Amber Resources* litigation, this Court held "Congress' 1990 amendment of the [CZMA] breached the . . . leases" and "entitled [plaintiffs] to treat the breach as an anticipatory repudiation and obtain restitution of . . . payments made for the leases." *Amber Res.*, 68 Fed. Cl. at 537–38.  All of the plaintiffs in the *Amber Resources* litigation, with the exception of Nycal,

---

[1] The California District Court case has changed names multiple times to reflect substitution of the current Secretary of the Interior (e.g., Norton, Jewell, Bernhardt).  When referencing docket materials and other related filings in the California District Court litigation and subsequent appeal, the Court will refer to this case as "*Bernhardt*" wherever practicable to reflect the current Secretary of the Interior.

"elected to receive the return of the lease payments in restitution." *Nycal Offshore Dev. Corp. v. United States*, 106 Fed. Cl. 222, 224 (2012), *aff'd*, 743 F.3d 837 (Fed. Cir. 2014) ("*Nycal I*").

On 24 February 2005, Nycal filed a separate suit in this Court "seeking to recover the profits it believe[d] it would have recouped absent the breach." *Id*. On 31 July 2012, this Court found in *Nycal I* that Nycal did not "prove[] that the breach was the proximate cause of any loss," nor did it prove "its entitlement to lost profits," therefore "abandon[ing] restitution as a remedy." *Id*. at 253–54. Nycal appealed, and on 20 February 2014, the Federal Circuit affirmed this Court's decision in *Nycal I*. *Nycal Offshore Dev. Corp. v. United States*, 743 F.3d 837 (Fed. Cir. 2014). The Federal Circuit held "Nycal failed to meet its burden of proving causation and thus [did] not establish[] its right to a lost-profits award." *Id*. at 849.

After the *Amber Resources* litigation concluded, all plaintiffs, except Nycal, "submitted letters to the United States attempting to assign all of their rights, title, and interests in the 36 leases back to the United States." Mot. for Order Lifting Directed Suspensions of Offshore Leases at 4, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 178 (June 17, 2013). The 36 leases were distributed as follows: 30 were processed, four were partially owned by entities that did not join the *Amber Resources* litigation, and two were owned by Nycal. *Id*. On 17 June 2013, DOI, as the defendant in the California District Court litigation, filed a motion to lift the 2001 court-ordered suspensions. *See generally id*. The DOI sought to lift the suspensions because the "basis for the court-ordered [2001] suspensions no longer exist[ed]" as "[n]one of the leaseholders . . . attempted to exercise any operational role" or seek new suspensions. *Id*. at 4. Without such activities or requests, the DOI had "no basis for conducting any further work on CZMA or [National Environmental Policy Act] requirements" as required by the 2001 suspension order. *Id*. If granted, the leases (including Nycal's lease) would expire by their own terms and revert to the government. *Id*.

By filing the motion to lift the suspensions, any remaining leaseholders seeking to continue suspensions were forced to oppose the DOI's motion. This resulted in those leaseholders opposing suspension becoming adverse parties to the DOI. *See generally id*. On 23 July 2013, the district court granted DOI's motion and lifted the 2001 lease suspensions, causing them to lapse.[2] *See* Order Granting Federal Defendants' Amended Unopposed Motion, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 180 (July 23, 2013) ("Order Granting Mot. to Lift Suspensions"). A review of the docket in the California District Court litigation shows no activity after the 23 July 2013 order granting the DOI's motion until 19 September 2017 when Nycal filed its motion to intervene. *Compare* Order Granting Mot. to Lift Suspensions, ECF No. 180 (July 23, 2013), *with* Motion to Intervene, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 181 (Sept. 19, 2017).

## II.    Procedural Background

On 10 April 2013, before DOI moved to lift the 2001 suspensions in the California District Court litigation, "the Regional Director of the Interior Department's Bureau of Safety

---

[2] The DOI submitted a proposed order with its motion to lift the 2001 court-ordered suspensions. *See* Mot. for Order Lifting Directed Suspensions of Offshore Leases at 6, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 178 (June 17, 2013). The district court adopted this order in full, incorporating the DOI's motion by reference in its order. *See* Order Granting Mot. to Lift Suspensions.

- 3 -

and Environmental Enforcement, Pacific Region, sent a letter to Nycal . . . [informing Nycal] the Department will request permission to lift the court-ordered directed suspensions [in the California District Court litigation]." Compl. ¶ 25 (internal quotation marks omitted). Nycal claims it was unaware the government moved to lift the lease suspensions as the government "never served the motion papers on Nycal." *Id.* ¶ 26. Due to this alleged failure to notify Nycal, "the District Court required the United States to re-notice their motion within [the California District Court litigation] and serve Nycal with the motion papers." *Id.* ¶ 27. Nycal alleges "the United States never served the re-noticed motion papers on Nycal." *Id.* ¶ 28. "In the summer of 2017, acting on newspaper articles indicating that the new Federal Administration was looking into reactivating oil and gas exploitation off the California coast, Nycal undertook to ascertain whether the directed suspension of the offshore California leases in [the California District Court litigation] . . . might . . . enable Nycal to move toward production." *Id.* ¶ 35. "Nycal was informed by counsel that according to documents filed in [the California District Court litigation], the directed suspension had been lifted some four years before." *Id.*

On 19 September 2017, Nycal moved to intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure ("FRCP") in the California District Court litigation. *See* Motion of Nycal Offshore Development Corporation to Intervene, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964). Nycal sought to intervene to protect its rights in the Gato Canyon Leases by opposing the DOI's motion to lift the 2001 court-ordered suspensions. *Id.* If granted intervention, Nycal would have undertaken activities to protect its interests to develop its holdings. *Id.* Additionally, Nycal's motion requested the court vacate as to Nycal the court's 23 July 2013 order lifting the lease suspensions. *Id.* On 24 January 2019, the district court denied Nycal's motion to intervene as untimely. Order Denying Motion to Intervene, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 213 (Jan. 24, 2019). On 20 February 2019, Nycal appealed the district court's denial of its motion to intervene to the United States Court of Appeals for the Ninth Circuit. Notice of Appeal to the 9th Circuit Court of Appeals, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 214 (Feb. 20, 2019) (docket entry appended to Def.'s Mot. at App. 84–85).

On 4 April 2019, while Nycal's appeal was pending before the Ninth Circuit, Nycal filed its complaint in this case. *See generally* Compl. On 3 June 2019, the government filed a motion to dismiss, arguing, among other things, 28 U.S.C. § 1500 bars this Court from exercising jurisdiction over Nycal's claims.[3] Def.'s Mot. at 35–37. This case was transferred to the undersigned Judge on 29 July 2019. *See* Order, ECF No. 11.

---

[3] The government additionally argues: (1) "Nycal's complaint does not state a valid taking claim," but instead, is a breach of contract claim, which it previously litigated to judgment in this Court in *Nycal I* and is therefore precluded from relitigating it; (2) Nycal's challenge to the "[Department of the Interior's] reading of its own regulations regarding lease termination or provision of notice" is not properly pursued in the Court of Federal Claims, and "prior to seeking judicial review of regulatory determinations, Nycal would have had to exhaust its administrative remedies, which it did not do;" (3) Nycal fails to state a taking claim because in 2013, Nycal had no interest remaining in the offshore leases because its "claim for total breach in *Nycal I* terminated any remaining obligations in the Leases . . . [and] the 2001 Suspension [of the Leases] specifically terminated the 1999 Suspension, leaving no suspension to resume in 2013;" (4) "Nycal engages in an improper collateral attack on [the California District Court litigation];" (5) Nycal cannot plead an illegal exaction claim because it "had no remaining rights under the [offshore] Leases;" and (6) Nycal fails to plead a taking without due process because "there is no cause of action that this Court can hear for taking without due process . . . [and] Nycal asserts an improper order and lack of notice that its own documents disprove." Def.'s Mot. at 9–39.

On 12 August 2019, Nycal filed a motion to withdraw from its Ninth Circuit appeal. *See* Mot. to Dismiss Case Voluntarily Pursuant to FRCP 42(b), *California, et al. v. David Bernhardt, et al.*, No. 19-15299 (9th Cir. Aug. 12, 2019), ECF No. 15. The Ninth Circuit granted Nycal's motion to withdraw on 13 August 2019 and dismissed Nycal's appeal. *See* Order, *California, et al. v. David Bernhardt, et al.*, No. 19-15299 (9th Cir. Aug. 13, 2019), ECF No. 16.

In the present action, Nycal filed a response to the government's motion to dismiss and a cross-motion to stay proceedings on 30 August 2019. *See* Cross-Mot. by Nycal Offshore Development Corporation to Stay Proceedings, ECF No. 15; Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, ECF No. 16. The government replied to Nycal's response to the motion to dismiss, in addition to responding to Nycal's motion to stay proceedings, on 13 September 2019. *See* United States' Reply in Supp. of Mot. to Dismiss, ECF No. 17; United States' Opp'n to Cross-Mot. by Nycal Offshore Development Corporation to Stay Proceedings, ECF No. 18. On 24 September 2019, Nycal filed a reply to the government's response to the cross-motion to stay proceedings. *See* Nycal Offshore Development Corporation's Reply in Further Supp. of its Cross-Mot. to Stay Proceedings ("Pl.'s Reply in Supp. of Cross-Mot."), ECF No. 19.

The Court held a status conference on 23 October 2019. *See* Order, ECF No. 23. As the parties agreed during the status conference, as an initial matter, the Court begins by only considering the government's threshold § 1500 jurisdictional argument before considering the other arguments presented in either the government's motion to dismiss or Nycal's motion to stay proceedings. *Id.* On 24 October 2019, the Court ordered the parties to submit supplemental briefs "addressing the issue of whether a motion to intervene filed in an ongoing action in another jurisdiction triggers the jurisdictional bar set forth in [§ 1500]." *Id.* at 1. On 15 November 2019, Nycal filed its supplemental brief, and on 27 November 2019, the government filed its supplemental brief. *See* Nycal Offshore Development Corporation's Suppl. Br. ("Pl.'s Suppl. Br."), ECF No. 24; United States' Suppl. Reply in Supp. of Mot. to Dismiss ("Def.'s Suppl. Br."), ECF No. 25. On 17 December 2019, the Court held oral argument on whether § 1500 bars Nycal's claims in this Court. *See* Order, ECF No. 23.

### III. Discussion

"In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence." *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013) (citing *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002)).

#### A. 28 U.S.C. Section 1500

The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.

"To determine whether § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action." *Brandt*, 710 F.3d at 1374 (citing *Trusted Integration, Inc.*, 659 F.3d at 1163–64). "If the answer to either of these questions is negative, then the Court of Federal Claims retains jurisdiction." *Id.*

Nycal's appeal of the denial of its motion to intervene in the California District Court litigation was pending at the time this case was filed. *Compare* Docketed Cause and Entered Appearances of Counsel, *California, et al v. David Bernhardt, et al*, No. 19-15299 (9th Cir. Feb. 20, 2019), ECF No. 1, *with* Compl., ECF No. 1 (April 4, 2019). The unique issue in this case is whether Nycal's pending appeal is considered "process" within the meaning of § 1500 to preclude this Court's jurisdiction over Nycal's claims.

### 1. Supreme Court Precedent and Discussion of § 1500

The Supreme Court reviewed § 1500's precedent and history in *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 310–12 (2011) and *Keene Corporation v. United States*, 508 U.S. 200, 206–07 (1993). In "the aftermath of the Civil War . . . residents of the Confederacy who had involuntarily parted with property (usually cotton) during the war sued the United States for compensation in the Court of Claims, under the Abandoned Property Collection Act." *Keene Corp.*, 508 U.S. at 206. "The so called 'cotton claimants'—named for their suits to recover for cotton taken by the Federal Government—sued the United States in the Court of Claims . . . while at the same time suing federal officials in other courts, seeking relief under tort law for the same alleged actions." *Tohono O'Odham Nation*, 563 U.S. at 311–12 (citing *Keene Corp.*, 508 U.S. at 206–07). "[C]otton claimants had difficulty meeting the statutory condition that they must have given no aid or comfort to participants of the rebellion . . . [so] they resorted to separate suits in other courts seeking compensation not from the Government . . . but from federal officials, and not under the statutory cause of action but on tort theories such as conversion." *Keene Corp.*, 508 U.S. at 206. In response, Congress enacted § 1500 "to curb duplicate lawsuits brought by residents of the Confederacy following the Civil War." *Tohono O'Odham Nation*, 563 U.S. at 311. "The jurisdictional bar in § 1500 was enacted in part to address the problem that judgments in suits against officers were not preclusive in suits against the United States." *Id.* at 315.

A 1967 law journal article, *Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents*, written by David Schwartz in private practice prior to becoming a judge on the United States Court of Claims, and cited by *Tohono O'Odham Nation* and *Keene Corporation*, addresses the historical background and judicial construction of § 1500. 55 Geo. L.J. 573, 574–80 (1967) (hereinafter referred to as the "Schwartz Article"). Claimants to seized property under the Abandoned Property Act were "given a remedy in the Court of Claims for any proceeds remaining from sale upon proof of his ownership and upon proof that neither he nor his assignor had given any aid or comfort to the rebellion." *Id.* at 575. In response, Congress enacted § 1500, which "reflects a robust response to the problem first presented by the cotton claimants." *Tohono O'Odham Nation*, 563 U.S. at 312. At the time Congress passed § 1500,

Senator Edmunds of Vermont, the statute's sponsor, read the proposed amendment on the Senate floor and added:

> The object of this amendment is to put to their election that large class of persons having cotton claims particularly, who have sued the Secretary of the Treasury and the other agents of the Government in more than a hundred suits that are now pending, scattered over the country here and there, and who are here at the same time endeavoring to prosecute their claims, and have filed them in the Court of Claims, so that after they put the Government to the expense of beating them once in a court of law they can turn around and try the whole question in the Court of Claims. The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts.

Schwartz, 55 Geo. L.J. at 576–77 (quoting 81 Cong. Globe, 40th Cong., 2d Sess. 2769 (1868)). Section 1500 "was thus aimed at those who, claiming ownership of seized cotton, had brought suits . . . against the Secretary of the Treasury or his agents. . . . [and] [i]f they should be defeated . . . [would] then be able to try again in the Court of Claims." *Id.* at 577. Therefore, "[f]rom 1868 to 1948 [§ 1500] barred the institution of a suit against the United States in the event there was pending elsewhere a suit on the same claim against an officer of the United States." *Id.* at 579. "No further debate or legislative explanation then or thereafter throws any more light on section 1500." *Id.* at 577.

The Supreme Court explained in *Matson Navigation Company v. United States*:

> [T]he declared purpose of [§ 1500] . . . was only to require an election between a suit in the Court of Claims and one brought in another court against an agent of the government, in which the judgment would not have been res adjudicata in the suit pending in the Court of Claims.

284 U.S. 352, 35–56 (1932), *superseded by statute*, Act of June 25, 1948, ch. 646, 62 Stat. 942, *as recognized in Keene Corp.*, 508 U.S. at 211 n.5. "The underlying reason for [§ 1500] was the limited application of the rule of res judicata in suits against the Government and against government officers. Schwartz, 55 Geo. L.J. at 578. "Without [§ 1500], . . . the claimants could retry the issues in a second suit . . . because the judgment in the first suit against the government officer-agent would not be res judicata in the second suit against the United States." *Id.* "The statute was *ad hoc* legislation aimed at a particular group of litigants who were then prosecuting suits." *Id.* A seminal treatise titled *Court of Federal Claims Jurisdiction, Practice, and Procedure* (2016), written by Matthew H. Solomson in private practice prior to becoming a judge on the Court of Federal Claims, discusses the statutory history and case law interpreting § 1500 (hereinafter the "Solomson Treatise"). The Solomson Treatise describes "the jurisdictional application of Section 1500 . . . by legal scholars as a vacillation 'between a strict, textual approach to section 1500 and a quixotic search for section 1500's true meaning in the contemporary jurisdictional landscape.'" Solomson Treatise at 21–2 (quoting Payson R. Peabody, Thomas K. Gump, & Michael S. Weinstein, *A Confederate Ghost That Haunts the Federal Courts: The Case for Repeal of 28 U.S.C. § 1500*, 4 Fed. Cir. B.J. 95, 102 (1994)) (discussing how, through statute, the Court of Federal Claims' and district courts' jurisdiction incorporate the principles of res judicata and collateral estoppel).

"Congress reenacted [§ 1500] at various times, most recently in 1948." *Tohono O'Odham Nation*, 563 U.S. at 312 (citing Act of June 25, 1948, 62 Stat. 942). "In 1948, the revisors of the Judicial Code amended the section to enlarge the class of suits pending elsewhere to include suits against the United States." Schwartz, 55 Geo. L.J. at 579. This amendment "barred a suit against the United States whenever there was pending elsewhere a suit on the same claim against either an officer or against the United States itself." *Id.* at 580. "After 1948 [§ 1500] became a flat prohibition on the maintenance of two suits against the United States, whatever the doubts as to the law or other need for such suits, even though the doctrine of res judicata would be available to foreclose relitigation of issues in successive suits against the United States." *Id.* "The most recent change to section 1500 in 1982 merely reflected the establishment of the Claims Court in place of the Court of Claims by substituting the former name for the latter." *UNR Indus., Inc. v. United States*, 962 F.2d 1013, 1019 (Fed. Cir. 1992) (citing Federal Courts Improvement Act of 1982, Pub. L. No. 97–164, 96 Stat. 40).[4]

Prior to § 1500's passage, "a claim in district court against a treasury agent would not be *res judicata* in a subsequent suit against the United States." Peabody et al., *supra*, 4 Fed. Cir. B.J. at 101. Since that time, "the jurisdictional landscape has changed dramatically." *Id.* at 107. "[S]ubsequent to the enactment of the Federal Tort Claims Act, district courts and the Court of Federal Claims both have jurisdiction to hear claims against the United States . . . whereas only the Court of Claims had congressionally mandated jurisdiction when section 1500 was enacted." *Id.* at 107–08. The Court of Federal Claims and federal district courts have jurisdiction to hear claims against the United States and "the doctrine of res judicata [operates] to prevent relitigation of any issues previously decided by either court." Schwartz, 55 Geo. L.J. at 580.

### B.     The Parties' Arguments

First, the government argues Nycal's pending appeal at the time it filed in the Court of Federal Claims is "sufficient process to come within the ambit of [§ 1500]." Def.'s Mot. at 36. Second, the government argues "[u]nder [the] plain meaning of 'process,' Nycal's District Court litigation and Ninth Circuit appeal were each a process . . . [because] Nycal's motion to intervene began a legal proceeding . . . which required the United States to participate to avoid the adverse consequences that Nycal sought." Def.'s Suppl. Br. at 4. Lastly, the government contends that the plain meaning of the term "process" is unambiguous, but to the extent the Court finds otherwise, the legislative history "provides that [§ 1500] is designed to prevent the United States from having the expense of defending a matter in a court of law and defending it simultaneously in this Court." *Id.* at 6. "Allowing the claim to proceed here would violate the purpose and history of § 1500." *Id.* at 8.

Nycal responds "that it is not until intervention is granted that a case pending in another court displaces a case subsequently filed [in the Court of Federal Claims]." Pl.'s Suppl. Br. at 2. Nycal further argues the purpose of § 1500 is to bar "a plaintiff, [who] at the time suit was filed in the Court of Federal Claims, had a suit pending in another federal court." *Id.* at 4 (quoting *Hymas v. United States*, 141 Fed. Cl. 144, 158 (2018)). Because Nycal's motion to intervene was denied, it claims it had no suit "pending" at the time of filing in the Court of Federal Claims. *Id.* Finally, Nycal argues that although it "had an appeal pending in the Ninth Circuit, . . . Nycal

---

[4] "In 1992, the Claims Court was renamed the U.S. Court of Federal Claims." Solomson Treatise, *supra*, at 1-9.

was not a participant in the action . . . and even as a would-be participant, sought a different form of relief than it does in the Court of [Federal] Claims." Pl.'s Reply in Supp. of Cross-Mot. at 3.

### C. Analysis

To determine whether § 1500 bars this Court from exercising jurisdiction, the Court must decide: "(1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action." *Brandt*, 710 F.3d at 1374 (citing *Trusted Integration, Inc.*, 659 F.3d at 1163–64). The parties' dispute centers around interpretation of the term "process" in § 1500. *See, e.g.*, Def.'s Suppl. Br. at 4 ("Under [the] plain meaning of 'process,' Nycal's District Court litigation and Ninth Circuit appeal were each a process."). To determine whether Nycal's Ninth Circuit appeal of the denial of its motion to intervene was "an earlier-filed 'suit or process,'" the Court must therefore begin by interpreting "process" within the meaning of § 1500. *Brandt*, 710 F.3d at 1374.

#### 1. Statutory Interpretation Framework

When interpreting a statute, "[a]s in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975). "Since it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses, we have often stated that '[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.'" *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772 (1984) (quoting *North Dakota v. United States*, 460 U.S. 300, 312 (1983)); *see also Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) ("We ordinarily assume, 'absent a clearly expressed legislative intention to the contrary,' that 'the legislative purpose is expressed by the ordinary meaning of the words used.'") (quoting *Am. Tobacco Co. v. Patterson*, 465 U.S. 63, 68 (1982)).

The Supreme Court recently noted the importance of applying the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin*, 444 U.S. at 42). The Court explained this particular canon of statutory construction is important because "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences." *Id.* "Until [Congress] exercises [its constitutional legislative authority], the people may rely on the original meaning of the written law." *Id.* "If a fog of uncertainty surrounded [statutes], if their meaning could shift with the latest judicial whim, the point of reducing them to writing would be lost." *Id.* "While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Id.* at 2074 (interpreting "money," as used in the statute at issue, "must always mean a 'medium of exchange.' But what *qualifies* as a 'medium of exchange' may depend on the facts of the day.").

The *Wisconsin Central* Court first identified and extracted the "key statutory term" requiring interpretation. *Id.* at 2070. Second, the Court interpreted the statutory term "consistent with [its] 'ordinary meaning . . . at the time Congress enacted the statute'" by reviewing passage-era dictionary definitions. *Wisconsin Central*, 138 S. Ct. at 2070–71 (quoting *Perrin*, 444 U.S. at 42). Third, the Court analyzed the term's historical definition in relation to its surrounding words and how those words might modify the term's meaning in the statute. *See id.* at 2071 ("Nor does adding the word 'remuneration' alter the calculus."). Fourth, the Court analyzed the term's usage within the "broader statutory context" to confirm its understanding of the interpreted term. *Id.* ("The broader statutory context points to the same conclusion the immediate text suggests."). Fifth, the Court "confirm[ed] [its] understanding" of the term's interpretation by evaluating its meaning compared to the historical legal context, companion statutes, and regulations using the same term. *See id.* at 2071–72 ("So even assuming the validity of the regulation, it seems only to confirm our understanding.").

In *District of Columbia v. Heller*, the Supreme Court used a similar framework to interpret language in a constitutional amendment. At the outset, the Court identified the text at issue and interpreted "its words and phrases . . . in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (citing *United States v. Sprague*, 282 U.S. 716, 731 (1931)). In doing so, the Court indicated the "[n]ormal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens" when the text was written. *Id.* at 576–77. Second, the Court extracted the relevant terms and interpreted their original meaning by reviewing passage-era dictionary definitions. *Id.* at 581 ("The 18th-century meaning is no different from the meaning today."). Third, the Court analyzed the terms' historical meaning in relation to the surrounding words to determine how the surrounding text might alter "the [terms'] most natural reading." *Id.* at 582. Fourth, the Court ascertained the term's ordinary meaning by analyzing examples of the term's usage in passage-era texts. *Id.* at 584 ("From our review of founding-era sources, we conclude that this natural meaning was also the meaning [the term] had in the 18th century."); *see also id.* at 605 ("[E]xamination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment . . . is a critical tool of [] interpretation."). Fifth, the Court "confirmed" its interpretation of the amendment by viewing its "historical background," placement within the Constitution itself, and history of the amendment. *Heller*, 554 U.S. at 592. Finally, the Court ensured its interpretation did not contradict its prior precedent interpreting the same text. *Id.* at 619–26.

Regarding Federal Circuit guidance on statutory interpretation, in *Bartels Trust for benefit of Cornell Univ. ex rel. Bartels v. United States*, the Court followed a similar procedure to interpret the Internal Revenue Code. 617 F.3d 1357 (Fed. Cir. 2010). First, the Court identified the language at issue by starting "with the text of the statute." *Id.* at 1361 (citing *Sharp v. United States*, 580 F.3d 1234, 1237 (Fed. Cir. 2009). The Court noted "[w]hen a statute's language is plain, [the court's] sole function is to enforce the statute according to its terms." *Id.*; *see also N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882 (Fed. Cir. 2018) ("'It is a fundamental canon of statutory construction that . . . words will be interpreted as taking their ordinary, contemporary, common meaning,' which may be derived from '[d]ictionaries from the era of [the statutory provision]'s enactment.'") (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). The Court looked to the plain meaning of the statute, and, finding no ambiguity, stated that the intent of Congress was "evident on the statute's face," ending the

statutory interpretation inquiry. *Bartels Trust*, 617 F.3d at 1361. The Court noted that "[w]hile our decisions recognize that legislative history can shed light on congressional intent, we have never held that legislative history trumps clear text." *Id.* at 1361; *see, e.g.*, *Sharp*, 580 F.3d at 1238; *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 396 (Fed. Cir. 1990); *but see N.Y. & Presbyterian Hosp.*, 881 F.3d at 877 (reviewing legislative history of the IRC for guidance on application of the code). "Rather, we must presume that Congress says in [a] statute what it means and means in a statute what it says." *Id.*

The Supreme Court has stated "there is no need to refer to the legislative history where the statutory language is clear." *Ex parte Collett*, 337 U.S. 55, 61 (1949); *see also Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 240 (2011) ("Since our interpretation . . . is the only interpretation supported by the text and structure [of the statute], even those of us who believe legislative history is a legitimate tool of statutory interpretation have no need to resort to it."); *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.").

### 2. Statutory Interpretation of § 1500

Following the steps the Supreme Court used to interpret legal texts in *Wisconsin Central* and *Heller*, the Court will follow four steps to interpret "process" in § 1500: (1) identify and extract the term requiring interpretation; (2) interpret the extracted term's meaning at the time of passage by reviewing passage-era dictionary definitions; (3) analyze the extracted term's historical definition in relation to the surrounding statutory text to determine if that text alters the term's meaning; and (4) evaluate the term as it fits within the individual statute and broader statutory scheme. After applying the extracted term to the text at issue, the Court will confirm its interpretation aligns with the historical context.

#### i. Identification of the Term Requiring Interpretation

First, the Court begins by identifying the statutory language at issue: "The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court any suit or *process* against the United States . . . ." 28 U.S.C. § 1500 (emphasis added). The present dispute turns on interpretation of the term "process" as used in § 1500. *See, e.g.*, Def.'s Suppl. Br. at 4 ("Under [the] plain meaning of 'process,' Nycal's District Court litigation and Ninth Circuit appeal were each a process.").[5] Therefore, the Court extracts the term it must interpret: "process."

#### ii. Passage-Era Meaning of "Process"

Second, the Court interprets the term "process" based on its ordinary meaning when § 1500 was passed by reviewing passage-era dictionary definitions. *See Wisconsin Central*, 138 S. Ct. at 2070. When Congress enacted § 1500 in 1868, "process" as used in the law meant "the whole course of proceedings, in a cause, real or personal, civil or criminal, from the original writ

---

[5] The government focuses its § 1500 arguments on the term "process," rather than "suit." While the government does not contend Nycal's unsuccessful motion to intervene in the California District Court litigation and appeal of the motion's denial is a suit, "suit or process" are both used to limit this Court's jurisdiction.

to the end of the suit." *Process*, A Dictionary of the English Language (1st ed. 1828); *see also Process*, Burrill's Law Dictionary (1st ed. 1851) ("The entire proceedings in any action or prosecution, real or personal, civil or criminal, from the beginning to the end."); *Process*, Bouvier's Law Dictionary (1st ed. 1856) ("In the English law, process in civil causes is called original process, when it is founded upon the original writ; and also to distinguish it from mesne or intermediate process, which issues pending the suit, upon some collateral interlocutory matter, as, to summon juries, witnesses, and the like; mesne process is also sometimes put in contradistinction to final process, or process of execution; and then it signifies all process which intervenes between the beginning and end of a suit."). Based on these definitions, "process" as it was understood in 1868 refers to the course of direct engagement between parties throughout a lawsuit.[6]

---

[6] Other courts have used corpus linguistics to interpret the original meaning of statutory terms. "Corpus linguistics describes language empirically with reference to books, scripts, magazines, newspapers, and more." *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 n.1 (3d Cir. 2019) (using corpus linguistics to interpret "previously"); *see also Richards v. Cox*, 450 P.3d 1074, 1085–86 (Utah 2019) (Lee, J., concurring) (concurring in majority opinion "to the extent it relies on corpus linguistic analysis" to support constitutional and statutory interpretation); *State v. Rasabout*, 356 P.3d 1258, 1275–82 (Utah 2015) (Lee, J., concurring) (explaining corpus linguistics and applying it to confirm the majority's interpretation of statutory term). "[I]n contrast to dictionaries, corpus linguistics is a method for studying language in use and can thus account for some aspects of context. Unlike dictionaries, corpus linguistics allows for the meaning of words to be investigated in light of other words in which they co-occur." Stefan Th. Gries & Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 B.Y.U. L. Rev. 1417, 1441. "Corpus linguists teach that 'the best way to find out about how language works is by analyzing real examples of language as it is actually used.'" Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 289 (2019) (quoting Paul Baker, *Glossary of Corpus Linguistics* 65 (2006)). "The concept underlying corpus linguistics is also consistent with the idea that an ordinary meaning is one that, in some sense, is general and cuts across contexts." Gries & Slocum, *supra*, at 1441.

"A database of . . . naturally occurring language is called a corpus." *Caesars Entm't Corp.*, 932 F.3d at 95 n.1. Courts "can use corpora to perform analyses unavailable in standard sources like dictionaries. These analyses include measuring . . . the statistical frequency of a word and the linguistic contexts in which it appears." *Id.* (citing Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 806–13, 828–32 (2018)). The Corpus of Contemporary American Usage ("COCA") "is 'the largest freely-available corpus of English, and the only large and balanced corpus of American English.'" *Rasabout*, 356 P.3d at 1281 (Lee, J., concurring) (quoting Mark Davies, *The Corpus of Contemporary American English: 410+ million words, 1990–present*, http://corpus.byu.edu/coca (2008)). The COCA is a search engine that allows a user "to generate a list of the most common words used near" a searched term "instead of guessing what they might be," which "will give some insight into the ordinary meaning" of the searched term. *Id.* "A COCA search yields a display of each use of [the searched term] . . . in the context of each of its most common word neighbors." *Id.* "By examining each instance of [the searched term] with its common word neighbors, we can assess the frequency of each of the attested meanings of the [searched term]." *Id.* Another widely used corpus is the Corpus of Historical American English ("COHA"), which is "the largest structured corpus of historical English." Lee & Mouritsen, *supra*, 127 Yale L.J. at 835 (quoting *Corpus of Historical American English*, BYU, https://www.english-corpora.org/coha/). The COHA "contains 'more than 400 million words of text from the 1810s-2000s . . . and the corpus is balanced by genre decade by decade.'" *Id.* By "[u]sing data from the COHA, [a user] can gather linguistic information from the decade that a statute was enacted, going back approximately 200 years." *Id.* "[T]he 400 million words of the COHA are spread out over 200 years . . . [and] the COHA remains the largest corpus of historical American English." *Id.* at 835–36.

Applying corpus linguistics to this case, the Court searched the COHA for historical usage of "process" within four words of "legal." The search identified 166 results from the years 1820 to 2009. After limiting this search to the years 1820 to 1868 to reflect the period when Congress passed § 1500, the corpus produced 48 results. After accounting for duplicate sources, the corpus produced 33 results. Most of these results use "process" to indicate full, formal legal proceedings. For example, one source from 1855 stated, "in pursuance of the warrant [and] legal process aforesaid, and of said further legal process and order last mentioned, the said Watson Freeman, Marshal . . . had in his custody the person of the said Anthony Burns, in the due and lawful execution of the said

### iii.     "Process" and its Surrounding Text

Third, the Court applies "process" and its historical definition to the surrounding statutory text to determine if it alters the meaning of "process." *Wisconsin Central*, 138 S. Ct. at 2070. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Additionally, "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

The closest term to "process" in the statute is "suit." *See* 28 U.S.C. § 1500 ("suit or process"). In the mid-nineteenth century, "suit" meant "[t]he prosecution of some claim, demand, or request." *Suit*, Burrill's Law Dictionary (1st ed. 1851). "Suit" at that time was "a term of more comprehensive import than *action*, though commonly used as synonymous with it." *Id.*; *see also Suit*, Bouvier's Law Dictionary (1st ed. 1856) (defining "suit" as "[a]n action"). "Action" meant "[a] formal proceeding (or series of proceedings,) in a court of justice, between parties plaintiff and defendant, by which the recovery of some alleged right is claimed by the one, and may be resisted by the other; and by which, also, such claim is enforced, or denied by the court." *Action*, Burrill's Law Dictionary (1st ed. 1851); *accord Action*, Bouvier's Law Dictionary (1st ed. 1856) ("A civil action is a legal demand of one's right, or it is the form given by the law for the recovery of that which is due."). "Suit" and "process" are joined by the word "or" in the statute. The disjunctive "or" is "used as a function word to indicate an alternative." *Or*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

---

warrant and legal process. . . ." A novel from 1827 read, "[i]nsupportable, however, as the evil of payment was, it was better to incur it spontaneously, than by means of legal process." Further, a source from 1862 stated, "[t]hrough legal process, a conviction of treason might work a forfeiture of the rebel's goods and chattels."

Only three results appeared to refer to something other than legal proceedings. For instance, an 1856 source wrote, "I examined the business, and have given it as my opinion that he should stifle the legal process by endeavoring to make a private arrangement with the creditors," which seems to refer to something other than a formal proceeding. One source used "process" to refer to "due legal process." Other sources used "process" in a colloquial sense, rather than as a legal term. These results are thus easily distinguishable.

Similarly, when the Court searched the COHA for "process" and "law" within four words of each other between 1820 and 1869, the corpus produced 76 results. Although some of these results refer to *due* process of law—a separate legal term of art—the Court excludes those results from its analysis. Of the responsive results was an 1845 source which wrote "[w]hen estates are settled by process of law. . . ." Another result from 1841 said, "[f]or we think it will be perceived every slaveholder . . . make[s] himself liable . . . to be prosecuted before our courts of law every time he presumes to whip or punish a slave without a 'process of law.'" Both results also seem to use "process" in the context of full, formal legal proceedings.

The COHA did not yield results for searches of "process" and "intervene" or "process" and "intervenor" within four words of each other within the relevant time frame. A search of "process" and "motion" within four words of each other yielded two results between 1820 and 1869, but neither was used in a legal context. A search of "process" and "suit" within four words of each other yielded one result from 1855, but the terms were also used outside the legal context.

In sum, a corpus linguistic analysis of the term "process" leads the Court to the same result as the passage-era dictionary definitions and confirms its interpretation of "process" within the meaning of § 1500—that is, *direct engagement* of a lawsuit between the parties.

When looking at the surrounding text, the historical definition of "process" is different from the modern usage of "suit or process" when used in a legal sense. The modern legal definition of suit is "[a]ny proceeding by a party or parties against another in a court of law." *Suit*, Black's Law Dictionary (11th ed. 2019). The modern legal definition of "process" is "[t]he proceedings in any action or prosecution." *Process*, Black's Law Dictionary (11th ed. 2019). Based on these definitions, "suit" in the modern legal sense encompasses both "suit" and "process" as those words were used in the mid-nineteenth century. Congress therefore needed to join the terms with the disjunctive "or" in order to properly establish the scope of § 1500's jurisdictional bar. If Congress were to enact the same provision today, the statute would presumably only require use of the term "suit" to accomplish this same objective. Analyzing the surrounding text therefore clarifies the Court's understanding of "process" within § 1500.

Congress' inclusion of the terms "suit" and "or" was not meant to modify the term "process." To the contrary, Congress meant for each "suit" and "process" to carry distinct meaning within the statute. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ."). In § 1500, "suit" refers to a party's prosecution of a claim or interest, and "process" refers to the course of proceedings in that suit.

### iv. "Process" in the Individual Statute and Broader Statutory Context

Fourth, the Court evaluates the meaning of "process" within § 1500 and its broader statutory context. Section 1500 acts as a limitation on this Court's jurisdiction, and nothing within the statute alters the Court's interpretation of "process." Rather, the use of "process" serves to clarify what type of proceeding before another court would preclude this Court from exercising jurisdiction. The broader historical statutory context similarly confirms this understanding.

What is now known as "Section 1500" was referred to as "Section 8" at the time of passage in 1868. *See* Act of June 25, 1868, Ch. 71, 15 Stat. 75. Congress placed Section 8 in Chapter 71 of 15 Stat. 75 along with other procedural law related to the Court of Claims. *Id*. Chapter 71 was titled "An Act to provide for Appeals from the Court of Claims, and for other Purposes" and governed the jurisdiction, prosecution, and procedure for the Court of Claims. *Id*. This act included procedural law regarding: a right of appeal to the United States Supreme Court on behalf of the United States from final judgments of the Court of Claims; timeframes for new trials; requirements of claimants to meet the Court's jurisdiction; assignment of the Attorney General to prosecute and defend cases; the ability of department heads to send claims to the court; and other procedural requirements for the clerk of the court. *Id*. Congress placed Section 8 within this chapter to limit the Court's jurisdiction from simultaneous claims against "any officer or person . . . acting . . . under the authority of the United States." *Id*. "Process" fits within this broader statutory context as a limitation on the Court's jurisdiction when a plaintiff has such "process" pending in another court. Section 8 as a whole, and its broader context within Chapter 71, therefore clarifies the types of procedural and jurisdictional limitations that applied to the Court of Claims at the time of passage. This reflects the current usage of "process" in § 1500—to clarify what type of proceeding before another court divests this Court of jurisdiction.

### v. Summary of Interpretation

After analyzing the meaning of "process" in § 1500 using the above four steps, the Court finds "process" means the entire course of legal proceedings. Nothing in the statute or broader statutory context modifies the original meaning of "process," based on the original meaning, as gleaned from passage-era dictionary definitions. *See Gamble v. United States*, 139 S. Ct. 1960, 1989 (2019) (Thomas, J., concurring) ("Our judicial duty to interpret the law requires adherence to the original meaning of the text.").

### 3. Application of "Process" to "Motion to Intervene"

As the Court interprets "process" within the meaning of § 1500, the Court must now decide "whether there is an earlier-filed 'suit or process' pending in another court" such that § 1500 precludes the Court from exercising jurisdiction. *Brandt*, 710 F.3d at 1374. Before making this determination, however, the Court must consider *what* was pending when Nycal filed its complaint in this Court. Nycal contends it "had no suit pending in the Northern District of California, because that court denied Nycal's motion to intervene," seemingly pointing to the motion to intervene. Pl.'s Suppl. Br. at 4. In contrast, the government indicates "[a]t the time Nycal filed this case, it had already initiated and was pursuing an appeal to the Ninth Circuit." Def.'s Suppl. Br. at 5.

When this Court makes a § 1500 determination, it must look at what was pending when the plaintiff filed its complaint in this Court. *See Brandt*, 710 F.3d at 1380 ("[A]t the time [the plaintiff] filed the instant case, he had no 'suit or process against the United States' pending in any other court."). When Nycal filed its complaint on 4 April 2019, its appeal was pending before the Ninth Circuit, which was not dismissed until 13 August 2019. *See* Order, *California, et al. v. David Bernhardt, et al.*, No. 19-15299 (9th Cir. Aug. 13, 2019), ECF No. 16. Although for the purposes of § 1500 the Court should consider the appeal as the "earlier-filed 'suit or process,'" the Federal Circuit specified in *Brandt* "once a claim is dismissed or denied, it is no longer 'pending' for § 1500 purposes until a motion for reconsideration or notice of appeal is filed." *Id.* at 1379–80. The Court considers Nycal's Ninth Circuit appeal as the vehicle through which it kept the "claim" to intervene in the California District Court litigation alive, and therefore the Court analyzes whether the denied motion to intervene could have been "suit or process" within the scope of § 1500. *See id.*

"Intervention" means "[t]he entry into a lawsuit by a third party who, despite not being named a party to the action, has a personal stake in the outcome." *Intervention*, Black's Law Dictionary (11th ed. 2019). Rule 24 of the Federal Rules of Civil Procedure provides two types of intervention: intervention as of right (Rule 24(a)) and permissive intervention (Rule 24(b)). Fed. R. Civ. P. 24. Rule 24(a)(2), the provision under which Nycal moved to intervene in the California District Court litigation, states a court:

> *must* permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2) (emphasis added). Rule 24(a) additionally requires a motion to intervene as of right to be "timely," which a court determines as a threshold matter. *Ackley v. United States*, 12 Cl. Ct. 306, 308 (1987) (citing *NAACP v. New York*, 413 U.S. 345, 365–66 (1973)) ("A motion to intervene in a pending action must be timely made, and timeliness is a threshold question committed to the sound discretion of the trial court.").

Nycal moved to intervene as of right in the California District Court litigation after it learned the district court lifted the lease suspensions. *See* Motion of Nycal Offshore Development Corporation to Intervene, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964). The United States District Court for the Northern District of California weighed three factors to determine whether Nycal's motion was timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." Order Denying Motion to Intervene at 4, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 213 (Jan. 24, 2019). The district court found "the stage of the proceeding and the reason for and length of the delay weigh[ed] heavily against allowing intervention." *Id*. The district court specifically noted the risk of "reignit[ing] prolonged litigation that effectively ended over four years ago when the Court lifted the lease suspensions."[7] *Id*. at 9. The district court therefore denied Nycal's motion. *Id*. at 10.

The government argues under the plain meaning of § 1500, Nycal's appeal of the district court's denial of its motion to intervene was a "process" because Nycal's appeal "began a legal proceeding . . . which required the United States to participate to avoid the adverse consequence that Nycal sought." Def.'s Suppl. Br. at 4. In response, Nycal argues "it is not until intervention is granted that a case pending in another court displaces a case subsequently filed [in the Court of Federal Claims]. Pl.'s Suppl. Br. at 2. As Nycal's motion to intervene was denied, it had no suit or process "pending" at the time of filing. Pl.'s Suppl. Br. 6.

The Court finds it helpful to map out what constitutes "suit or process" on a continuum of legal options and procedures available to parties during a dispute. Based on the Court's statutory interpretation analysis, "suit" is the primary term defined by commencing a lawsuit against another party. *See Suit*, Burrill's Law Dictionary (1st ed. 1851) ("[t]he prosecution of some claim, demand, or request."). On the far end of the spectrum, then, are legal options which satisfy the definition of a "suit:" filing a complaint in district court. *See Complaint*, Black's Law Dictionary (11th ed. 2019) ("[t]he initial pleading that starts a civil action"). On the opposite end of the continuum are legal options or procedures which are *not* "suit or process." These legal options, hereinafter called "informal legal options," may include informal discussions between parties, retaining counsel, or sending a cease and desist letter. Although

---

[7] Specifically, the district court stated: (1) "Nycal did not move to intervene until approximately four years" after the Court lifted the suspension in the California District Court litigation, and "[j]udgment in this case was entered . . . approximately sixteen years before Nycal's motion to intervene;" (2) if permitted to intervene, "Nycal's intervention would unsettle and reignite prolonged litigation that effectively ended over four years ago when the Court lifted the lease suspensions;" (3) "[t]he prejudice to the parties also weighs against intervention" because "Nycal waited over ten years . . . to move to intervene after it knew that its interests might be impacted adversely" and "Nycal made explicit reference" to the California District Court litigation in its breach claim in *Nycal I*; and (4) "Nycal's argument that [the government] did not properly serve it with the motion for an order lifting the lease suspensions is . . . unavailing" because "Nycal was aware of this case at least as early as February 24, 2005, when it filed its complaint in [*Nycal I*]," and "was on constructive notice and knew that [the government] would or could seek to lift the suspensions in this action." Order Denying Motion to Intervene at 4–9, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 213 (Jan. 24, 2019).

"process" encompasses the entire course of proceedings, the precursor to such proceedings is the filing of a "suit." In other words, the term "process" presupposes the existence of a "suit"—there cannot be "process" without there also being a "suit." *See Process*, Burrill's Law Dictionary (1st ed. 1851) ("The entire proceedings in any action or prosecution, real or personal, civil or criminal, from the beginning to the end."); *Suit*, Burrill's Law Dictionary (1st ed. 1851) ("[t]he prosecution of some claim, demand, or request."). Any action or procedure constituting "process" under § 1500 falls underneath "suit" on this continuum and therefore requires a "suit" as a prerequisite to satisfying a "process." The government does not argue Nycal's appeal of the denied motion to intervene is a "suit"—only a "process," which, according to the government's interpretation, must necessarily fall somewhere between "informal legal options" and a "suit" on the Court's described continuum. If the government agrees by implication "suit" is not met in this case, then under the Court's interpretation of the terms "suit" and "process" in 1868, "process" similarly cannot be met.

Here, the Court must analyze a procedural action that falls between the two extremes of the above-described continuum: a district court denial of a motion to intervene—stated differently, a motion to intervene that was never granted. The motion to intervene itself must be something more than an informal legal option because it involves attempting action in a court through a court filing. Filing a motion to intervene, however, necessarily requires an already ongoing case between other parties. Black's Law Dictionary defines "intervenor" as "[s]omeone who voluntarily *enters* a pending lawsuit." *Intervenor*, Black's Law Dictionary (11th ed. 2019) (emphasis added). By using the present tense of "enter," this definition implies the party's request for intervention was already granted, as opposed to styling the definition as someone "who seeks to enter" a pending lawsuit. Once granted, the party who filed the motion to intervene becomes a party to the suit. *See Intervention*, Black's Law Dictionary (11th ed. 2019) ("The entry into a lawsuit by a *third party* who, despite not being named a party to the action, has a personal stake in the outcome." (emphasis added)).

While a motion to intervene is pending, or after a court denies a motion to intervene, the third party who files the motion is nothing more than a *prospective intervenor. See Marks v. United States*, 24 Cl. Ct. 310, 316 (1991) (finding the plaintiff did not have a "claim" against the government until the district court permitted plaintiff to intervene in that suit). Consequently, a prospective intervenor does not have a "suit" until a court grants its motion to intervene.[8] In this case, the district court's denial of Nycal's motion to intervene must therefore be less than "process," because Nycal was never granted entry into the original "suit." Since Nycal did not become party to the preexisting "suit," it therefore could not have a pending "process," as "process" under the meaning of § 1500 first requires the existence of, and plaintiff's participation in, a "suit."

---

[8] Although not the issue directly before the Court in this case, this Court previously held when a party intervenes in a district court litigation (i.e., its motion to intervene is granted), then later files a complaint in this Court raising a claim based on the same operative facts as the district court litigation, the party's intervention satisfies "suit or process," and § 1500 divests this Court of jurisdiction. *Vane Minerals (US), LLC v. United States*, 111 Fed. Cl. 253, 256 (2013). In that case, the plaintiff filed a notice dismissing its complaints-in-intervention in the earlier-filed district court litigation *after* the government filed a motion to dismiss for lack of jurisdiction in the Court of Federal Claims case. *Id.* at 255. This Court, relying on *Tohono O'Odham Nation* and *Keene Corporation*, reasoned because the pendency of another action for § 1500 purposes is determined at the time the plaintiff files its complaint in this Court, "the dismissals occurred too late to cure the jurisdictional impediment under section 1500." *Id.* at 256.

Finally, even if Nycal's motion to intervene was a "suit or process" within the meaning of § 1500, it is not clear whether it was "for or in respect to" Nycal's claims before this Court. *See Brandt*, 710 F.3d at 1374. "[T]wo suits are for or in respect to the same claim when they are 'based on substantially the same operative facts. . . .'" *Tohono O'Odham Nation*, 563 U.S. at 311 (quoting *Keene Corp.*, 508 U.S. at 212). Here, the Northern District of California found Nycal's motion was untimely, reasoning "Nycal waited over ten years . . . to move to intervene after it knew that its interests might be impacted adversely in this action." Order Denying Motion to Intervene at 9, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 213 (Jan. 24, 2019). Although ruling on a motion to intervene as of right necessarily involves some discussion on the merits pursuant to FRCP 24(a)(2), the district court's ruling addressed only the timeliness of Nycal's motion to join the case. *See id.* at 4–9. Nycal appealed that denial on timeliness grounds. *See* Notice of Appeal to the 9th Circuit Court of Appeals, *Bernhardt*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001) (No. 99 Civ. 4964), ECF No. 214 (Feb. 20, 2019) (docket entry appended to Def.'s Mot. at App. 84–85). As opposed to the procedural nature of the original denial and subsequent appeal, Nycal's claims in this Court are based on its leasehold interests. *See* Compl. ¶¶ 2–3. The "operative facts" underlying Nycal's appeal of the timeliness issue are therefore different from those supporting its claims in this Court. Consequently, even if the Court found Nycal's motion to intervene, or appeal thereof, constituted "process" under § 1500, neither would be "for or in respect to" its claims presented in this case.

The Court finds Nycal did not have a pending "suit or process" against the United States that was "for or in respect to the same claims" in this case at the time it filed its complaint. *Brandt*, 710 F.3d at 1374.[9]

### 4. "Suit or Process" Within Historical Context of § 1500

To confirm the Court's interpretation of "process" in § 1500, the Court recalls the historical context of § 1500. *Heller*, 554 U.S. at 592. Congress enacted the statute after the Civil War to address the number of cotton claimants who "sued the United States in the Court of Claims . . . while at the same time suing federal officials in other courts, seeking relief under tort law for the same alleged actions." *Tohono O'Odham Nation*, 563 U.S. at 311–12. Congress intended "to curb duplicate lawsuits" the cotton claimants filed. *Id.* at 311. Unlike the cotton claimants, Nycal did not initiate or file another lawsuit in district court based on the same operative facts as this case. Nycal sought to intervene in the California District Court litigation, but was denied entry, and did not join those plaintiffs—separate entities—pursuing their claims in the separate suit. This confirms the Court's interpretation of "suit" and "process" to require entry into the underlying case pending in the district court.[10]

---

[9] While not raised by the parties, the Court notes that under § 1500, a "process" must equal a previously filed "cause of action" in another court. *See* 28 U.S.C. § 1500 ("[This Court] shall not have jurisdiction of any claim. . . pending in any other court any suit or *process* . . . at the time when the *cause of action*. . . arose." (emphasis added)). In *Tohono O'Odham Nation*, the Supreme Court viewed "cause of action" synonymous with "case" and "claim" as the necessary component to divest this Court of jurisdiction. *See Tohono O'Odham Nation*, 563 U.S. at 312. In that case, the "cause of action" was a nearly identical lawsuit with nearly identical facts filed in another court. *Id.* In this case, a motion to intervene is something less than the necessary "case," "claim," or "cause of action" as referenced in *Tohono O'Odham Nation*.

[10] The government argues the legislative intent behind § 1500 was "to prevent the United States from having the expense of defending a matter in a court of law and defending it simultaneously in this Court." Def.'s Suppl. Br. at 6. Consistent with the Supreme Court's review of § 1500, and as discussed in the Schwartz Article, the "underlying reason for [§ 1500] was the limited application of the rule of res judicata in suits against Government and against

## IV.     Conclusion

The Court holds Nycal did not have a "process" pending in another court for or in respect to the underlying claims in this case prior to filing its complaint in this case. Accordingly, the Court hereby **DENIES-IN-PART** the government's motion to dismiss to the extent the government argues 28 U.S.C. § 1500 bars Nycal's claims in this Court.

The Court does not address the remaining arguments in the government's motion to dismiss. On or before 1 May 2020, the parties shall file a joint status report addressing the ongoing district court litigation in the United States District Court for the District of Columbia filed after the complaint in this case and propose a schedule for further proceedings regarding the other pending motions in this case.

**IT IS SO ORDERED.**

s/ Ryan T. Holte<br>
RYAN T. HOLTE<br>
Judge

---

government officers," thus requiring cotton claimants to make an election on which Court to seek relief. Schwartz, 55 Geo. L.J. at 578. As Senator Edmunds explained at the time of passage, § 1500's intent was "to put to [cotton claimants to] election . . . who have sued the Secretary of the Treasury and the other agents of the Government in more than a hundred suits that are now pending . . . who are here at the same time endeavoring to prosecute their claims." *Id.* at 576. The historical background supports the position that Congress intended to prevent fully adjudicated claims against government officials from being re-filed in the Court of Federal Claims. This intention is consistent with the more-recent Supreme Court review of § 1500 discussed *supra*. The Court takes no position on what the legislature intended but considers § 1500's history solely to address the government's historical confusion. *See MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 539 (2011) ("[T]he [Federal] Circuit stated that '[w]hen a statute's language is plain, our sole function is to enforce the statute according to its terms,' and explained: 'While our decisions recognize that legislative history can shed light on congressional intent, we have never held that legislative history trumps clear text.'") (citing *Bartels Trust*, 617 F.3d at 1361).